IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

01 SEP 25 PH 1: 06

U.S. DISTRICT COURT
N.D. OF ALABAMA

VEETTA WELLINGTON,                    }
                                      }
        Plaintiff,                    }
                                      }
v.                                    }        CASE NO. CV 00-B-0917-NE
                                      }
CRAVEN H. CROWELL, JR., et al.,       }        **ENTERED**
                                      }
        Defendants.                   }        SEP 2 5 2001

## MEMORANDUM OPINION

Currently before the court are defendants' second and third motions for partial summary

judgment, and plaintiff's motion to strike affirmative defense and motion to strike declarations of

Douglas H. Finke and Jay D. McCarver .  Upon consideration of the record, the submissions of

the parties, the argument of counsel, and the relevant law, the court is of the opinion that

plaintiff's motions are due to be denied, defendants' motions are due to be granted, and this case

is due to be dismissed.[1]

Plaintiff VeEtta Wellington ("plaintiff" or "Wellington"), an African-American, is a

former Accounting Officer-Payroll, SA-1, at the Tennessee Valley Authority's ("TVA") Widows

---

[1] At the conclusion of oral argument, the court informed the parties of its intention to
grant summary judgment in favor of defendants.  The court requested that counsel for defendants
prepare a proposed memorandum opinion for the court and required that counsel send a copy of
the proposed opinion to counsel for plaintiff.  Although the court has made some changes to the
opinion prepared by defendants' counsel, it has adopted a large part of the proposed opinion.
The court is aware of the admonition of the Eleventh Circuit that district courts not delegate "the
task of drafting important opinions to litigants." *Chudasama v. Mazda Motor Corp.*, 123 F.3d
1353, 1373 n.46 (11th Cir. 1997).  This is an important opinion and the court had reached a firm
decision as to the appropriate outcome before requesting a proposed opinion from defendants'
counsel.  Counsel for defendants drafted the opinion according to the express instructions of the
court as to its contents.  These instructions were stated to defendants' counsel, with plaintiff's
counsel present, following oral argument.



Creek Fossil Plant ("Widows Creek").[2]  At issue are claims raised in four of five equal

opportunity ("EO") administrative complaints plaintiff filed with TVA's Equal Opportunity

Compliance staff on May 2, 1995, May 9, 1998, May 27, 1999, and September 24, 1999,

respectively.  The court previously dismissed the claims raised in a fifth administrative

complaint and three of five claims raised in the May 9, 1998, administrative complaint.[3]

Before the court are Wellington's claims (1) that she was subjected to race discrimination

when she was not reclassified from an Accounting Officer-Payroll, SA-1, to Accounting Officer-

Payroll, SA-2; (2) that she was subjected to race discrimination and retaliation when she was

reassigned mail delivery duties on March 9, 1998; (3) that she was subjected to race

discrimination and retaliation when she was issued a warning letter for insubordination on

April 14, 1998; (4) that her managers subjected her to continuing harassment beginning in April

1998 due to her race; (5) that her termination resulted from race discrimination, disability

discrimination and retaliation; (6) that she was subjected to race discrimination when her

application for retirement benefits was denied; and (7) that she was subjected to race

discrimination, disability discrimination and retaliation when she received an unsatisfactory

---

[2] The defendants in this case are Craven H. Crowell, Jr., the former Chairman of the TVA Board of Directors, and the two current incumbent members of the TVA Board, Skila Harris and Glenn L. McCullough, Jr.  Plaintiff sued defendants their official capacities as members of the TVA Board.

[3] In the Order filed October 12, 2000, the court dismissed with prejudice plaintiff's claims that she was subjected to race discrimination and retaliation when she was harassed on November 20, 1997, denied a computer software package on or about November 20, 1997, and again on January 13, 1998, and denied compensatory time off on January 16, 1998. This opinion addresses plaintiff's remaining claims against defendants.

service review in April 1999.  She brought this action under 42 U.S.C. 1981,[4] Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16 (1994); and the Americans with

Disabilities Act ("ADA"), 42 U.S.C. §§ 12111-12213 (1994).

## I. MATERIAL FACTS

### A. Reclassification

Wellington began her employement with TVA in 1976 as a clerical employee.  On April

1, 1985, Wellington was promoted to the position of Accounting Officer-Payroll, SA-1.  (Talley

2d Decl., Ex. 10 at 2.)  On August 19, 1994, she submitted a Position Classification Request

("PCR") to Roy Webb ("Webb"), her supervisor, requesting that her Accounting Officer-Payroll

position be reclassified from the SA-1 to the SA-2 level.[5]  (Wellington Dep., Ex. 2.)  Wellington

based her request for reclassification on the fact that she performed additional duties previously

performed by two other employees for the period of February 1991 to November 1993.  (Talley

2d Decl., Ex. 10 at 2.)  However, Wellington concedes that she had ceased performing those

higher level duties before she submitted the PCR on August 19, 1994.  (*Id.*)

Wellington's PCR was processed in accordance with the provisions of the applicable

bargaining agreement, that is, the Articles of Agreement between the TVA and the Salary Policy

Employee Panel ("Articles").  Wellington and Webb jointly revised her position description

("PD") and submitted it to Judy Newcomb ("Newcomb"), the Human Resource Consultant for

Widows Creek (Talley 2d Decl., Ex. 6 at 4, 5.)  Newcomb then forwarded the revised PD to

---

[4] 42 U.S.C. § 1981 affords no remedy for a federal employee's claim of employment discrimination. *See Canino v. U.S. E.E.O.C.*, 707 F.2d 468, 472 (11th Cir. 1983).  Therefore, plaintiff's claims under that section are due to be dismissed.
[5] Wellington had filed an earlier PCR in December 1993, but voluntarily withdrew it about two weeks later.  (Wellington Dep. at 20, 22, 68; Talley 2d Decl., Ex. 10 at 3-4.)

Sharon Tousek ("Tousek"), Manager, Human Resource Programs and Services, for evaluation. (*Id.*)

Tousek performed the evaluation, determining that Wellington's position was correctly classified as Accounting Officer-Payroll, SA-1. (Tousek Decl. ¶ 4.) In reviewing the PD, Tousek used the applicable guide chart jointly developed and agreed upon by TVA and the union. She concluded that the PD was consistent with the guide chart language and classification criteria for an SA-1, rather than an SA-2. (*Id.*) While the union disagreed with Tousek's evaluation, neither the union nor Wellington requested a joint audit as provided for under the terms of the Articles. (*Id.* ¶ 8.) Consequently, Wellington's request was denied.[6]

When the PCR and PD were submitted to Tousek for evaluation, she was not given any biographical data on Wellington. (Tousek Decl. ¶ 9.) Newcomb did not inform Tousek that Wellington was African-American. (*Id.*) Tousek had no discussions concerning Wellington with Webb. (*Id.*) Tousek was unaware of Wellington's race when she determined that Wellington's position should remain classified at the SA-1 level. (*Id.*) Tousek did not learn of Wellington's race until after Wellington had filed an administrative complaint challenging the decision not to reclassify her position, and Tousek was asked to give a sworn statement about her evaluation of Wellington's PCR and revised PD on September 8, 1995, approximately ten months after Tousek performed the evaluation. (*Id.*)

_____

[6] As a check and balance on properly evaluating the positions, TVA uses a two-person review process. (Tousek Decl. ¶ 5.) Under this system, after Tousek completed her evaluation, she forwarded the PD to Donna Bruno in TVA's Labor Relations for an independent evaluation. (*Id.*) In this case, after conducting an independent evaluation, Bruno concurred with Tousek's evaluation that Wellington's position should not be reclassified to the SA-2 level. (*Id.*)

## B. Reassignment of Mail Duties

The Payroll Department at Widows Creek was a two-person department. Wellington was the supervisor and her only subordinate was Charles Franks ("Franks"), Payroll Clerk, SB-4. For a number of years, Franks, who is white, had the primary responsibility for delivering the mail at Widows Creek. The backup mail delivery duties were performed by custodial staff. (Bynum Dep. at 12-14.) In particular, Arthur Phillip Bynum ("Bynum"), Custodian Supervisor, who is black, performed these duties in Franks's absence. (*Id.* at 14.) The primary and secondary responsibilities for the delivery of the mail had been handled in this fashion for the previous four or five years. (*Id.* at 13.)

On November 14, 1997, Steve Standefer ("Standefer"), Production Manager and supervisor of the custodial staff, sent a memorandum to Widows Creek management informing them that the custodians would no longer be able to support and perform the mail delivery duties in Franks's absence, due to concerns with staffing and additional workload. (Wellington Dep., Ex. 11.) Standefer suggested that the backup role be assigned within the Payroll Department. (*Id.*)

In response to the Standefer memorandum, Wanda M. Vogt ("Vogt"), Acting Business Manager and Wellington's supervisor, sent Wellington an e-mail informing her that she was assigned the responsibility of performing the mail duties in Franks's absence. (Wellington Dep. at 120.)[7] Wellington balked at the assignment, asserting that such duties are in the custodians' job description and that she did not have the time to perform the mail duties. (*Id.* at 117.)

---

[7] Vogt became Wellington's supervisor in 1997. (Vogt Dep. at 14-16; Wellington Dep. at 78.)

However, Wellington acknowledged that the duties were assigned to her "at the suggestion of Steve Standefer who is the custodians' supervisor." (*Id.* at 120.)

Wellington contacted an EO counselor, claiming that she received the assignment due to her race and prior EO participation. Both Franks and Bynum, who were responsible for the primary and secondary mail duties until November 14, 1997, had engaged in no prior EO activity. (Talley 2d Decl. ¶ 23, Ex. 20 at 3.) In an effort to avoid a complaint of discrimination, on December 19, 1997, Douglas H. Finke ("Finke"), the Plant Manager, decided to remove the mail duties from the Payroll Department. (Talley 2d Decl., Ex. 20 at 1.)

Later, Finke reconsidered his decision to remove the mail duties from the Payroll Department. When Finke relinquished the Payroll Department of its mail duties, he did not have a workable alternative strategy to get the mail delivered effectively and efficiently throughout the site. (*Id.,* Ex. 15 at 5-6; Finke Dep. at 77-78.) After the decision, no Widows Creek employee had the specific responsibility of delivering the mail. (Finke Dep. at 77-78.) Instead, over the next three and one-half months, the mail duties were "handled as a side duty by individuals going back and forth between the physical location[s] [of] the plant." (Talley 2d Decl., Ex. 15 at 6; Finke Dep. at 77-78.) As a result, the mail was not being delivered timely or efficiently. (Finke Dep. at 78.)

On March 9, 1998, Finke issued a memorandum reassigning the mail duties to the Payroll Department. (Wellington Dep., Ex. 8.) The primary duty to deliver the mail once again fell to Franks. Finke also decided that Wellington would be responsible for mail delivery when Franks was absent from work. (Finke Dep. at 77-78.) In accordance with Finke's memorandum, in Franks's absence, "this function will be performed by Veetta Wellington." (Wellington Dep.,

Ex. 8.)  As Finke pointed out, "it is also customary for a supervisor to take up the slack when one of [his or her] employees is not there."  (Finke Dep. at 77.)  Indeed, as stated in her position description, Wellington was specifically responsible for the "quality" and the timely "completion" of Franks's work.  (Tousek Decl., Ex. D at 5.)  As a result, under the reassignment, Wellington was required to deliver the mail only when Franks was absent.

## C.  Letter of Warning

On April 10, 1998, Franks was on annual leave.  (Talley 2d Decl., Ex. 16 at 11-12.)  This was the first time Franks was absent after the mail duties had been reassigned to the Payroll department.  (*Id.*)  In Franks's absence, Wellington was responsible for ensuring that the mail was delivered.  (*Id.*)  The evidence also shows that although Vogt directed Wellington to deliver the mail, Wellington failed to do so.  (*Id.*)  While Wellington contends that she was performing other work that prevented her from handling the mail, it is undisputed that Wellington did not inform her supervisor, Vogt, that the mail was not going to be delivered, and made no other arrangements to ensure that the mail would be delivered.  (*Id.*)

On April 14, 1998, Finke met with Wellington, Vogt, and Wanda Lyda, a TVA employee who attended the meeting at Wellington's request.  In the meeting, Finke issued Wellington a letter of warning for insubordination.  (Wellington Dep., Ex. 12.)  The letter stated that Wellington had the responsibility "for mail delivery at the Widows Creek Fossil Plant in the absence of Charlie Franks."  (*Id.*)  Finke also told Wellington that he "did not tell [her] that [she was] not responsible in Charlie's absence."  (*Id.*)  The letter further informed Wellington that she was given a "legitimate direct order to deliver the mail" by Vogt, that she had failed to carry out that directive, and that the failure to do so constituted "insubordination."  (*Id.*)

7

The letter stated that failure to carry out a supervisor's order "is unacceptable and will not be tolerated." (*Id.*) He did not demote or suspend her. He did not dock her compensation. He did not transfer or threaten to transfer her to another position with less significant duties and responsibilities. There is no evidence that the letter has served as the basis for any action against Wellington. There is no evidence that the warning letter affected any of the terms or conditions of Wellington's employment.

In the warning letter, Finke simply informed Wellington that, in the future, he expected her "to carry out all legitimate requests from [her] supervisor" and further advised her that future refusals of a supervisor's directive could result in disciplinary action. (*Id.*) Wellington left the meeting upset, sought medical treatment (and still remains under the care of a doctor and a licensed clinical social worker), and failed to return to work. (Wellington Depo. at 8-9.)

## D. Harassment

On April 15, 1998, the day after receiving the letter of warning for insubordination, Wellington called Finke's office, and told his secretary that she was under a doctor's care and would not be reporting to work. Two days later, Vogt called Wellington, requesting the name of her doctor and the diagnosis. Wellington told Vogt that she "would bring the required certification from the doctor when [she] returned to work." (Wellington Dep. at 183.) On May 1 and 5, 1998, Vogt called Wellington's residence; however, on each occasion, Wellington was not available. (Wellington Dep., Ex. 17 at 1.) Vogt left one message with Wellington's mother and the other on the answering machine, stating Widows Creek management's "need to know [her] current condition and the date [she] expect[ed] to return to work." (*Id.*) Wellington did not return the calls. (Wellington Depo. at 182.)

8

On May 18, 1998, Finke sent a letter to Wellington, seeking more information about her medical situation and an expected date of her return to work. (Wellington Dep., Ex. 17 at 1.) The letter stated in part, "Your presence on the job is important to the productivity and efficiency of the Widows Creek Payroll Office. Currently, we do not know your expected return date. Without this information, we are unable to plan for the future of work you normally perform, and this places a burden on both management and coworkers." (*Id.*)  In response, Wellington provided a note from Dr. Appareddy dated May 20, 1998. (*See* Wellington Dep., Ex. 20 at 1.) Dr. Appareddy's note stated that Wellington "is currently depressed & anxious & is fragile and [I] would recommend that she not return to work, for another 12 weeks and be reassessed at the end of 12 weeks, to determine if she can return to work.  She is also attending counseling with Barbara Seals, LCSW." (*Id.*)  The note contains no expected date of return. (*See id.*)

Eight weeks later on July 15, 1998, still with no indication of Wellington's expected date of return, Finke sent a letter advising her that she would exhaust all of her sick leave by July 31, 1998. (Wellington Dep., Ex. 17 at 2.)  The letter also requested follow-up information from her doctor. (*Id.*)  On July 16, 1998, Wellington responded by letter, requesting that she be placed on annual leave once she had exhausted all of her sick leave. (*Id.*, Ex. 18 at 1.)  The letter provided no expected return date. (*Id.*)  Wellington provided a note from Dr. Appareddy dated July 20, 1998, stating that Wellington was "unable to work" and recommending that she "not return to work for another 20 weeks and be reassessed at the end of 20 weeks, to determine when she can return to work," (*Id.*, Ex. 20 at 2.)

Widows Creek management sent letters on three other occasions, September 3, 1998; October 5, 1998; and February 11, 1999. (*See id.*, Ex. 17 at 3-5.)  Each requested that

9

Wellington provide information about returning to work. (*See id.*)  Neither Wellington nor

Dr. Appareddy ever provided management with any information indicating that Wellington was

able or willing to resume the responsibilities of the position she left in April 1998. (*See id.*,

Exs. 18, 20.)

Specifically, Finke's letter dated February 11, 1999, stated that Widows Creek had been

holding her position "in anticipation" of her return since April 15, 1998. (Id., Ex. 17 at 5.)  The

letter also stated that due to her continued absence, if she was not able to return to work by

April 15, 1999, it would "be necessary to fill the position on a permanent basis because of [her]

unavailability for work." (*Id.*)  On March 4, 1999, Wellington responded with a note stating, "I

am still under the doctor's care and my return to work date still remains unknown." (*Id.*, Ex. 18

at 6.)

Widows Creek management sent similar letters to employees in similar circumstances to

plaintiff's.  Widows Creek management sent Jack Champion, a white male Widows Creek

employee, seven identical letters over a six-month period of time, June 30, 1998, through

November 3, 1998, when he was absent from the workplace. (Boggs Decl. ¶ 4, Ex. 1.)

Wellington's union representative, Barry Coulter, also testified that the letters Wellington

received are "standard" correspondence that TVA management sends to any employee,

regardless of race, who "is not coming to work." (Coulter Dep. at 42, 48.)

Wellington did not request Widows Creek management to stop sending her correspon-

dence.  Defendants presented undisputed evidence showing that Wellington wrote Widows

Creek management at least six letters during the relevant period.  None of them indicated that

Wellington considered the letters from management to be harassing.  None requested that

management's letters not be sent. (*See* Wellington Dep., Ex. 18.)  Dr. Appareddy sent five notes to Widows Creek management during the relevant period, none of which indicated that she considered any of management's letters to be harassing. (Appareddy Dep., Ex. 2.)

Dr. Appareddy testified that the letters management sent to Wellington were "very reasonable." (Appareddy Dep. at 23-24.)

## E.  Termination

On March 4, 1999, in response to Finke's letter advising her that he could keep her on leave without pay (LWOP) through April 15, 1999, Wellington stated that she had no expected date of return to work. (Wellington Depo., Ex. 18 at 6.)  In response, Lee Boggs ("Boggs"), Human Resource Officer, contacted Dr. Appareddy's office to find out if she could provide any possible expected return date for Wellington. (Boggs Dep. at 51.)  Dr. Appareddy provided no such date.  Instead, on March 11, 1999, Dr. Appareddy's staff telecopied the December 7, 1998, note stating that Wellington's return date was still unknown. (*Id.*; Appareddy Dep. at 21-22).[8] Dr. Appareddy testified that as of March 11, 1999, she did not know when Wellington would be able to return to work. (Appareddy Dep., at 22-23.)  According to Dr. Appareddy, it was any-one's guess whether Wellington would return to work in a month, six months, or a year. (*Id.* at 35-36).  Dr. Appareddy referred to her December 7, 1998, note as a "blanket" statement that "[she] just [did not] know when [Wellington] will be able to return to work," and whenever that time came, she would inform management. (*Id.* at 27, 36.)

---

[8] Dr. Appareddy's December 7, 1998, note was the last of five notes she sent to Widows Creek advising management of Wellington's inability to return to work. (Wellington Dep., Ex. 20.)

11

Similarly, Wellington testified that she wanted to be placed on indefinite LWOP.
(Wellington Dep. at 235.)  Wellington testified that "I did not know when I was going to be able
to come to work" and that is "why I did not put a date on [the request for LWOP]." (*Id.*)  Finke
granted Wellington's request for LWOP through April 15, 1999. (*Id.*, Ex. 17 at 5.)  Wellington
did not ask Finke to reconsider his decision extending LWOP only through April 15, 1999 or to
extend LWOP for a longer period. (*Id.* at 232-35).

On March 12, 1999, approximately 11 months after Wellington left her job, Finke made
the decision to propose her termination, effective April 16, 1999. (Wellington Dep., Ex. 17 at 6.)
The notice of termination informed Wellington that she was being terminated due to her
unavailability, since April 15, 1998, to perform the duties of the Accounting Officer-Payroll,
SA-1, position. (*Id.*)  Despite this notice and the five previous letters requesting a date that
Wellington would return to work, neither Wellington nor her physician ever provided such a
date. (*Id.*, Exs. 18, 20.)  Both Wellington and her doctor stated that the return date was
indefinite. (Appareddy Dep. at 22-23, 27, 35-36; Wellington Dep. at 235.)  Wellington did not
respond to the notice of proposed termination or seek reconsideration. On April 16, 1999,
Wellington was terminated.

**F.  Retirement Benefits**

On April 12, 1999, Wellington completed and submitted an application to the Tennessee
Valley Authority Retirement System ("TVARS")[9] for immediate retirement benefits.
(Wellington Dep. at 197-98, and Ex. 14.)  Under TVARS Rules and Regulations, a TVA

---

[9] TVARS is a legal entity separate and apart from TVA. (Talley 3d Decl., Ex. 6.)  The
TVARS Board, not TVA management, is responsible for administering TVARS in accordance
with TVARS Rules and Regulations. (*Id.*)

employee may apply for and be granted immediate retirement benefits, unless he or she has been terminated for cause. (Smith Decl. ¶ 2.) If an employee is terminated for cause, the employee cannot receive his or her pension prior to attaining age fifty-five. (*Id.*) Specifically, Section 6.B.2.b.iii. of the TVARS Rules states in part: "If the member's services as an employee are discontinued by TVA through an act or delinquency of the member . . . the pension cannot commence before attained age 55." (Smith Decl., Ex. 2.)

When Wellington applied for immediate retirement benefits, she was forty-eight years old. (Wellington Dep., Ex.14.) Consequently, Wellington's application for immediate retirement benefits was denied. (Smith Decl. ¶¶ 2, 5.) Wellington speculates that Finke, Vogt, and Boggs were responsible for denying her application. (Wellington Dep. at 193.) However, there is no evidence supporting Wellington's supposition. To the contrary, William E. Smith, TVARS Retirement Officer, was assigned responsibility for processing Wellington's application for retirement benefits. (Smith Decl. ¶¶ 1, 2.) As the responsible Retirement Officer, Smith determined that Wellington was not eligible for immediate retirement benefits because she had been terminated for cause and was less than fifty-five years old. (*Id.* ¶ 5.) It is undisputed that Smith was unaware of Wellington's race and her prior EO activity when he rejected her application for immediate retirement benefits. (*Id.* ¶ 6.)

Wellington testified that two former white employees at Widows Creek, Samuel T. Roden ("Roden") and James W. Cox, Jr. ("Cox"), were terminated for cause, but applied for and received immediate retirement benefits. (Wellington Dep. at 194-97.) Roden was born on August 23, 1941, ceased work on June 1, 1998. (Boggs Decl. ¶ 5.) Cox was born February 22, 1938 and ceased work on August 25, 1994. (*Id.*) Consequently, both were over the age of 55

13

when their TVA employment ended and would have been eligible for immediate retirement

benefits whether or not they were terminated for cause under TVARS rules.  (Smith Decl. ¶ 2.)

## G.  Unsatisfactory Service Review

On April 16, 1998 Vogt rated Wellington's performance in a service review for the

period of April 16, 1998, to April 15, 1999.  (Wellington Dep. at 288-89.)  In the service review,

Vogt rated Wellington's performance during this period as unsatisfactory due to her

unavailability for work.  (Vogt. Decl. ¶ 4.)  The record evidence shows that it was prepared over

30 days after Finke had issued Wellington's notice of termination on March 12, 1999.

(Wellington Dep., Ex. 17 at 6.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact

and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The party asking for summary judgment bears the initial burden of showing that no genuine

issues exist.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v.*

*S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule

56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine

issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).   A dispute is genuine "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of

inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

**A. Standards of Substantive Law**

    **1. Disparate Treatment**

    In any action alleging disparate treatment by an employer, the plaintiff must prove that the employer acted with a discriminatory motive. *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). To establish a prima facie case of discrimination, a plaintiff may employ direct evidence of discriminatory intent, statistical proof of a pattern of discrimination, or circumstantial evidence. *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989). The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon whether the plaintiff's proof is direct or circumstantial in nature.

    There is no direct evidence to support plaintiff's claim of disparate treatment race discrimination. Thus, plaintiff must rely on circumstantial evidence to support her claims. Because plaintiff is relying on circumstantial evidence to support her claims, the court is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence). Under this framework, the plaintiff bears the initial burden of establishing a

15

prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53.

If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. Defendant's burden to rebut the presumption created in such a situation is one of production rather than proof, requiring defendant to articulate a legitimate, nondiscriminatory reason for its action. *Burdine*, 450 U.S. at 257-58.

If the defendant succeeds in carrying this burden, then any "presumption of discrimination created by the *McDonnell Douglas* framework drops from the case, and the factual inquiry proceeds to a new level of specificity." *Combs,* 106 F.3d at 1528 (quotation omitted). The plaintiff must then prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., discrimination). *Id.* Defendant is entitled to summary judgment, if plaintiff does not proffer evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions. *See Chapman v. AI Transport*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

To avoid summary judgment, plaintiff must submit sufficient nonconclusory evidence that defendant's articulated legitimate reasons were pretextual. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471-72 (11th Cir. 1991); *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989). Plaintiff must put forth concrete evidence that casts sufficient doubt on defendant's proffered reasons such that a reasonable fact finder could conclude that those reasons did not actually motivate the employment decisions. *See Reeves v. Sanderson Plumbing Products, Inc.,*

16

120 S.Ct. 2097, 2108-09 (2000); *Combs*, 106 F.3d at 1538; *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1083-84 (11th Cir. 1990).

### 2. Retaliation

In order to establish a prima facie case of unlawful retaliation in violation of Title VII, plaintiff must show: (1) that she engaged in statutorily protected expression; (2) that she experienced an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *See Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) (citation omitted). Once a prima facie case has been established, the defendant must come forward with legitimate, nondiscriminatory reasons for the employment action. *Id.* If the defendant offers legitimate reasons for the employment action, the burden shifts back to the plaintiff to prove that the reasons offered by the defendant are pretextual. *Id.*

### B. Adverse Employment Action

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (citing 42 U.S.C. § 2000e-2(a)(1)). A Title VII plaintiff may establish a prima facie case of race discrimination by proving that (1) she is a member of a protected class; (2) she was subjected to adverse employment action; and (3) her employer treated similarly-situated persons outside of her protected class more favorably. *See id.*, 115 F.3d at 1562. Title VII requires an actionable adverse employment action before a claim of race discrimination may proceed. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1246 (11th Cir. 2001) (Proof of an "adverse employment action is an

indispensable element of a Title VII plaintiff's case.").

For a plaintiff to show an adverse or tangible employment action, she must establish that

she has suffered "a significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

"An adverse employment action is an ultimate employment decision, such as discharge or failure

to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or

privileges of employment, deprives him or her of employment opportunities, or adversely affects

his or her status as an employee.'" *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th

Cir. 2000) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir. 1997)).  To

prove adverse employment action in a Title VII discrimination case, plaintiff must "show a

*serious and material* change in the terms, conditions, or privileges of employment." *Davis*,

245 F.3d at 1239 (emphasis in original).

Similarly, to establish a prima facie case of retaliation under Title VII, a plaintiff must

demonstrate that she was subjected to an actionable adverse employment action. *See id.*  Title

VII's protection against retaliatory discrimination extends to adverse actions that fall short of

ultimate employment decisions. *See Wideman v. Walmart Stores, Inc.*, 141 F.3d 1453, 1456

(11th Cir. 1998).  However, "[t]here is some threshold level of substantiality that must be met for

unlawful discrimination to be cognizable under the anti-retaliation clause." *Id.*  Whether an

action is sufficient to constitute an adverse action for purposes of a retaliation claim must be

determined on a case-by-case basis using both subjective and objective standards. *Gupta*,

212 F.3d at 587.

18

Defendants contend that the reassignment of the mail duties, the issuance of the letter of warning, the sending of allegedly harassing letters, and the completion of an unsatisfactory service review are actions that are not substantial enough to constitute actionable adverse employment actions. Therefore, defendants argues, with respect to these actions, because plaintiff cannot make out a prima facie case of illegal discrimination or retaliation, plaintiff's claims arising out of these actions are due to be dismissed. The court agrees.

### 1. Reassignment of Mail Duties

Wellington was assigned responsibility for the mail delivery in Franks's absence. The Payroll department was a two-person department, with Wellington as the supervisor. This assignment simply required Wellington, as Franks's supervisor, to perform the "customary" practice of a supervisor of taking up the slack when her subordinate is out of the office. (Finke Dep. at 77.) This customary practice was in fact clearly stated in Wellington's position description: she was responsible for the "quality" and the timely "completion" of Franks's work. (Tousek Decl., Ex. D at 5.) Assigning plaintiff backup mail delivery duties does not meet the *Ellerth* standard for a tangible employment action because it does not constitute a "significant change" in Wellington's "employment status." *See* 524 U.S. at 761.

Absent a demonstratively discriminatory motive, courts respect the employer's unfettered discretion in "decid[ing] which of several qualified employees will work on a particular assignment." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997). An employer's ability to assign work and to allocate its resources is fundamental to its business judgment:

> Work assignment claims strike at the very heart of an employer's business
> judgment and expertise because they challenge an employer's ability to allocate

> its assets in response to shifting and competing market priorities.  The same
> concern exists for public entities . . . , which must balance limited personnel
> resources with the wide variety of critically important and challenging tasks
> expected of them by the public.

*Davis*, 245 F.3d at 1244.  Therefore, "changes in assignments or work-related duties do not

ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or

work hour changes." *Mungin*, 116 F.3d at 1557 (citing *Kocsis v. Multi-Care Mgmt.*, 97 F.3d

876-886-87 (6th Cir. 1996); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th

Cir. 1993)).

There is no evidence that TVA's reassignment of backup mail duties to Wellington was

"accompanied by a decrease in salary" or benefits.  *See Mungin*, 116 F.3d at 1557.  Moreover,

there is no evidence that this assignment was a demotion or was a transfer with significantly

lesser and different responsibilities.  Considering the absence of evidence of frequent

absenteeism on Franks's part, the reassignment resulted in only a minor change to Wellington's

duties.  *See Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016-17 (8th Cir. 1999) ("Minor

changes in duties or working conditions that cause no materially significant disadvantage do not

meet the standard of an adverse employment action . . .").

In *Kocsis v. Multi-Care Management, Inc.*, Kocsis was hired as an RN for the position of

nursing supervisor, but was later reassigned to the position of Unit RN requiring her to perform

work that "was much more physically demanding than that of nursing supervisor."  97 F.3d 876,

879.  Kocsis filed suit alleging that her employer violated the ADA.  In affirming the district

court's entry of summary judgment, the Sixth Circuit held that Kocsis's reassignment did not

rise to the level of an actionable adverse employment action because she "enjoyed the

same . . . rate of pay and benefits, and her duties were not materially modified.  She submitted no

evidence that she lost any prestige in her position because of her working conditions or her title change." 97 F.3d at 886-87.

Not unlike Kocsis, Wellington has presented no evidence of lost pay, benefits, or prestige flowing from the assignment of backup mail duties to her. This failure of proof warrants the entry of summary judgment. *See Kocsis v. Multi-Care Management, Inc.*, 97 F.3d at 886-87; *Mungin*, 116 F.3d at 1557. Because the assignment of backup mail duties to Wellington does not constitute a *serious and material* change in the terms, conditions, or privileges of employment, it is not sufficient to support a prima facie case of racial discrimination. *See Davis*, 245 F.3d at 1239. (emphasis in original).

Similarly, assigning the backup mail delivery duty to Wellington does not rise to the level of an adverse employment action, for purposes of retaliation. In *Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000), a college professor asserted that the university retaliated against her by, among other things, assigning her to teach more credit hours than other professors, and not assigning her to teach a class that she wanted to teach. 212 F.3d at 587. In rejecting Gupta's retaliation claim, the court held that the University's actions did not constitute adverse employment actions. *See id.*, 212 F.3d at 588. The court reasoned that "[a] university can assign its professors to teach the classes it needs them to teach." *Id.*, 212 F.3d at 588. If requiring Gupta to teach more hours for a whole semester than similarly situated professors does not constitute an adverse action for the sake of a retaliation claim, then requiring Wellington to perform backup mail delivery duties on the rare occasions when Franks was absent does not either. TVA, like the employer in *Gupta*, can require its employees to perform assignments "it needs them to [perform]." *See id*. Like Gupta, Wellington presents no evidence "that she was in

21

any way entitled to or particularly deserving" of a special exemption from this assignment. *See id*. Therefore, because the assignment of backup mail delivery duties to Wellington does not rise to the level of adverse action, it is insufficient to support her retaliation claim.

### 2. Letter of Warning

Finke issued a letter of warning to Wellington when she failed to perform the backup mail duties. The letter of warning was not a demotion. It did not result in a loss of pay or other benefits, and was not a transfer with significantly lesser and different responsibilities. Nor was the warning letter used as a basis for any other employment action. Under the law, since the letter of warning here was not, and did not lead to, a significant change in employment status, it does not constitute an actionable adverse employment action as a matter of law. *See, e.g., Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 409-10 (6th Cir. 1999) (counseling memorandum did not constitute materially or significant adverse employment action); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) (counseling memoranda resulting in neither disciplinary action nor "negative performance evaluations, standing alone, cannot constitute an adverse employment action . . .").

The Eleventh Circuit recently held that letters or memoranda of warning or reprimand do not constitute adverse employment actions where they are not the basis for any other employment action. *See Davis*, 245 F.3d at 1237-43 (holding that two counseling memoranda criticizing employee's work were not adverse employment actions because they were unaccompanied by loss of pay or benefit, did not result in demotion, or otherwise affect employee's terms and conditions of employment). There is no evidence that the letter served as the basis for any adverse action against Wellington, or affected any of the terms, conditions, or

privileges of her employment. Because the letter of warning did "not lead to tangible job consequences, it does not "form a permissible predicate for a Title VII suit." *See Davis*, 245 F.3d at 1241.

Numerous other cases also hold that letters of warning, admonishment, or reprimand are not adverse employment actions under Title VII. *See, e.g., Brown v. Brody*, 199 F.3d 446, 458 (D.C. Cir. 1999) (holding that a letter of admonishment did not constitute adverse employment action because it did not affect employee's grade or pay); *Walker v. Washington Metro. Area Transit Auth.*, 102 F. Supp. 2d 24, 28-29 (D.D.C. 2000) (holding that notice of caution did not constitute adverse employment action); *Lucas v. Cheney*, 821 F. Supp. 374, 376 (D. Md. 1992) (holding that although the letter of reprimand was issued after plaintiff engaged in protected activity, it did not "represent an adverse employment action within the scope of Title VII."), *aff'd*, 991 F.2d 790 (4th Cir. 1993).

Wellington relies on the case of *Colson v. Grohman*, 174 F.3d 498, 511 (5th Cir. 1999), for the proposition that a reprimand is an actionable adverse employment action under Title VII. The court, however, finds that *Colson* is inapposite. *Colson* simply reiterates the adverse action standard that a public employee must establish before prevailing against an  employer who has infringed on the employee's First Amendment, or other constitutional, rights.[10] The standard for adverse employment actions in Title VII cases is different from First Amendment cases. *See Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). The position advocated by Wellington is

_____

[10] Indeed, the *Colson* decision is no different than the Eleventh Circuit decision in *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994), in which the court reiterated the standard for determining what constitutes an adverse action in cases alleging constitutional violations.

contrary to the Title VII standard articulated by the Supreme Court in *Ellerth* and by the
Eleventh Circuit in *Davis* and *Gupta*.

For the same reasons set forth above, Wellington's retaliation claims fail because she was
not subjected to an actionable adverse employment action. The Eleventh Circuit case of
*Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274 (11th Cir. 1999), is instructive. In *Graham*
the Eleventh Circuit held that Graham failed to make out a prima facie case for retaliation
because the challenged memorandum regarding Graham's absences and warning of possible
future disciplinary action for failure to follow the company's leave policy did not constitute an
actionable adverse employment action, particularly because the "plaintiff did not suffer any
repercussions" stemming from the memorandum. 193 F.3d 1274, 1284 (11th Cir. 1999).
Wellington, too, "did not suffer any repercussions" as a result of the warning letter. Therefore,
the letter does not constitute an actionable adverse action that could serve as the basis for Title
VII race discrimination or retaliation claims.

### 3. Harassment[11]

Wellington claims that Widows Creek management subjected her to racial harassment
from April 16, 1998, to April 15, 1999, the period of time that she was absent from the

_____

[11] Wellington moved the court to strike defendants' affirmative defense of failure to
exhaust administrative remedies for the hostile environment claim, because defendants failed to
assert the affirmative defense in their answer. (Mot. Strike Aff. Def.) Because defendants did in
fact assert it in the ninetieth defense of their answer, this motion is due to be denied. For the
sake of the motions for partial summary judgment, this ruling is irrelevant. First, plaintiff did
exhaust administrative remedies by filing an EO complaint on April 13, 1999, within sixty days
of the last allegedly harassing incident, the letter of termination dated March 12, 1999. Second,
plaintiff's claim of harassment is due to be dismissed on the merits.

workplace.[12]  In order to sustain a claim of harassment, Wellington must show (1) that she

belongs to a protected class; (2) that she was subjected to harassment that was sufficiently severe

or pervasive to alter the conditions of her employment and create an abusive and hostile

environment; and (3) that the harassment was based on an impermissible factor. *See Mendoza v.*

*Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).  Wellington's only evidence supporting this

claim consists of letters sent to her by TVA management dated May 18, 1998; July 15, 1998;

September 3, 1998; October 5, 1998; and February 11, 1999.

When viewed individually or collectively, the letters did not effect a significant change to

Wellington's employment status, a threshold requirement for an adverse action. *See Ellerth*,

524 U.S. at 761; *Davis*, 245 F.3d at 1237-43; *Gupta*, 212 F.3d at 587.  Rather, all five letters sent

to Wellington's home merely requested information about plaintiff's medical condition and her

plans to return to work.  The letters were management's attempt to regularly communicate with

Wellington about her medical situation and plans to return to work.  This was a legitimate

management concern because an employee's availability for and attendance at work is an

essential qualification for his or her job.  *See, e.g., Jackson v. Veteran's Admin.*, 22 F.3d 277,

278-79 (11th Cir. 1994) (finding in context of ADA claim that "qualified" means that the

claimant can perform the essential functions of the job, and holding that an individual's presence

at work on a routine basis is an essential job function).

The Eleventh Circuit recently reiterated that the Federal courts do not "sit as a super-

personnel department that reexamines an entity's business decisions." *See Davis*, 245 F.3d

---

[12] In her administrative complaint, Wellington claimed that she was harassed due to her
race, sex, and alleged disability.  However, in Count III of her judicial complaint she asserts only
that the alleged harassment was based on her race.  (Compl. ¶¶ 115-17).

at 1244. Employers expect to be free to communicate with their employees about their ability to work, and when they are absent from the workplace due to illness, an employer should have the reasonable expectation that it can communicate with those employees about their intended date of return.

Even assuming the existence of an adverse employment action, Wellington presented no evidence showing that the alleged harassment by the five letters was either severe or pervasive. At issue are five benign letters sent over the course of a ten-month period, unaccompanied by any discriminatory comment, remark, or slur. The hallmark of racial or sexual harassment is that the "workplace [must be] permeated with 'discriminatory intimidation, ridicule, and insult.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Incidents of harassment cannot be merely episodic, but rather must be sufficiently continuous and concerted in order to be considered pervasive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n.1 (1998). Five letters sent over a ten-month period does not constitute the "continuous and concerted" conduct that is necessary to show the pervasiveness required in a prima facie case for harassment. The Eleventh Circuit is in accord. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246-47 (11th Cir. 1999) (listing numerous cases rejecting harassment claims based on conduct far more serious than the five letters here requesting information about when Wellington would return to work).

It is undisputed that Widows Creek management sent Jack Champion, a white male Widows Creek employee, seven identical letters over a six-month period of time, from June 30, 1998, through November 3, 1999. There is no evidence that the letters either individually or collectively were based on the impermissible factor of race. (Boggs. Decl. ¶ 4, Ex. 1.) The absence of such evidence requires the entry of summary judgment on this claim. *See Mendoza*,

195 F.3d at 1253 (Edmondson, J., concurring) (sexual harassment plaintiff must prove men were treated considerably different, and better, in order to prevail); *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996) ("If Bullock had called Galloway a 'sick woman,' and a similarly situated male coworker a 'sick man,' there would be no ground for an inference of sex discrimination."); *Vore v. Indiana Bell Tel. Co., Inc.*, 32 F.3d 1161, 1164 (7th Cir. 1994) (no actionable racial harassment where black employee was vulgar to all employees, not just white employees); *Weinheimer v. Rockwell Int'l Corp.*, 754 F. Supp. 1559, 1565 (M.D. Fla. 1990), *aff'd*, 949 F.2d 1162 (11th Cir. 1991); *Vermett v. Hough*, 627 F. Supp. 587, 607 (W.D. Mich. 1986).  Because these five letters are not indicative of either severe or pervasive conduct, and were not based on an impermissible factor, they can afford no basis for relief.

### 4. Unsatisfactory Service Review

Defendants do not dispute that the April 16, 1999, service review was unfavorable. However, they presented undisputed evidence showing that on March 12, 1999, Finke decided to terminate Wellington effective April 16, 1999.  Because the unsatisfactory service review was not written until April 16, 1999, over a month after Finke made the termination decision, it could not have adversely affect Wellington's status as a TVA employee.  It did not affect her compensation, benefits, or any term or condition of employment.  Because there is  no evidence suggesting that the letter was, or led to, a significant change in or tangible consequence to her employment status, it does not constitute an adverse employment action upon which Wellington may base a discrimination claim.  *Ellerth*, 524 U.S. at 761; *Davis*, 245 F.3d at 1241; *Gupta*, 212 F.3d at 587-88 ("An action which, it turns out, had no effect on an employee is not an

'adverse' action.").

Receipt of an unfavorable performance review, standing alone, does not constitute an

actionable employment action under Title VII. *See, e.g., Sweeney v. West*, 149 F.3d 550, 556

(7th Cir. 1998) (holding that two counseling statements that are similar to negative performance

evaluations do not constitute adverse action); *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir.

1996) (holding that performance rating that did not alter responsibilities or salary was not

adverse action). The submission of an unfavorable service review that had no effect upon the

terms or conditions of Wellington's employment does not rise to the threshold level of

substantiality that must be met to be cognizable under the anti-retaliation clause. *See Wideman*,

141 F.3d at 1456. Therefore, the unfavorable service review does not constitute an actionable

adverse action that could serve as the basis for Title VII race discrimination or retaliation claims.

Furthermore, the assignment of backup mail duties, the letter of warning, the five benign

letters, and the unfavorable service review considered collectively do not constitute adverse

action. Because these actions, considered both individually and collectively, do not serve as an

adequate basis for a prima facie case of race discrimination or retaliation, defendant's motions

for summary judgment are due to be granted on these claims.

## C. Remaining Claims

TVA's actions denying Wellington's PCR, terminating her employment, and rejecting

her application for immediate retirement benefits are actionable employment actions because

they are *serious and material* changes in the terms, conditions, or privileges of employment. *See*

*Davis*, 245 F.3d at 1239   Nevertheless, with respect to each of these actions, plaintiff cannot

prove other elements of the prima facie case. This failure of proof requires the dismissal of

Wellington's claims regarding these personnel actions.

### 1. Reclassification

Wellington alleges that the PCR, requesting reclassification from the SA-1 level to the SA-2 level, was denied due to her race. (Compl. ¶ 7.) To establish a prima facie case of discriminatory failure to promote, Wellington is required to prove (1) that she belongs to a protected class; (2) that she did not receive the sought after promotion; (3) that she was qualified for the promotion; and (4) that a similarly situated employee outside of her protected group was promoted. *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000). Wellington failed to meet her burden.

It is well settled that Wellington must first prove that the official responsible for the challenged adverse action had knowledge of her race when that decision was made. *See Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) (holding that an employee cannot establish a prima facie case of race discrimination where the employer has no knowledge of the employee's race); *Gibson v. Frank*, 785 F. Supp. 677, 682 (S.D. Ohio 1990); *Chandoke v. Anheuser-Busch, Inc.*, 843 F. Supp. 16, 19 (D.N.J. 1994) (holding there is no prima facie case of race discrimination where decisionmaker does not know plaintiff's race); *Dodson v. Marsh*, 678 F. Supp. 768, 772 (S.D. Ind. 1988) ("The plaintiff cannot prove that she was a victim of discrimination . . . when the selecting official did not even know the plaintiff's race.").

The record is undisputed that Tousek was the TVA official responsible for evaluating the PCR and agreed-upon position description. Tousek testified that she was unaware of Wellington's race at the time of her evaluation and determination that Wellington's position should not be reclassified. Wellington presented no evidence showing Tousek was aware of her

race. Wellington also did not present any evidence showing that Tousek was influenced by any TVA official who was aware of Wellington's race and did not want the position reclassified because of her race. For these reasons, defendants argue that summary judgment is appropriate. The court agrees. Plaintiff's failure to show that the responsible official was aware of her race when she made the decision not to reclassify Wellington's Accounting Officer position from the SA-1 to the SA-2 level is fatal to her prima facie case. Consequently, defendants are due summary judgment on Wellington's reclassification claim. *See Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("In order to satisfy the 'causal link' prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action."); *Morisky v. Broward County*, 80 F.3d 445, 447-49 (11th Cir. 1996) (holding that an employer cannot be liable for disability discrimination when the responsible officials for the challenged personnel actions were unaware of the employee's impairment); *Miller v. Mercy Hosp.*, 720 F.2d 356 (4th Cir. 1983) (holding district court's finding of race discrimination was clearly erroneous where the evidence failed to demonstrate that the employer was aware of the plaintiff's race).[13] Because Wellington has failed to make out a prima facie case of race discrimination for the denial of her reclassification request, this claim is due to be dismissed.

---

[13] Dismissal of this claim is also warranted for two other reasons. First, while Wellington refers to this claim as background in paragraph 7 of the complaint, she does not allege a cause of action or seek relief for the denial of the PCR in any of the five counts in the complaint. Therefore, this claim does not meet the requirements of Rule 8(a), Fed. R. Civ. P., requiring "a short and plain statement of the claim showing that the pleader is entitled to relief." Second, at oral argument, counsel for Wellington withdrew this claim.

### 2. Termination

Wellington claims that her termination was based on race and retaliation for her prior EO participation. It is well established that one of the elements of the plaintiff's prima facie case is that she was qualified for the job in question. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). In this case, Wellington must show that at the time of the termination, she was capable and willing to come to work. Wellington does not dispute that the law clearly recognizes that attendance is a necessary element for most jobs. *See Jackson*, 22 F.3d at 278-79 (finding that "qualified" means that the claimant can perform the essential functions of the job, and holding that an individual's presence at work on a routine basis is an essential job function). "An employee who is 'unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones." *Moore v. Payless Shoe Source, Inc.*, 139 F.3d 1210, 1213 (8th Cir. 1998) (quoting *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir. 1997)) *vacated on other grounds by* 526 U.S. 1142 (1999). *See Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996*)* ("Because [the plaintiff] could not attend work, he [was] not a 'qualified individual with a disability' under the ADA."); *Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994) (holding that coming to work regularly is an "essential function"); *Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d at 213 ("[A] regular and reliable level of attendance is a necessary element of most jobs.").

The evidence establishes that Wellington was not able to work at the time she was terminated. She was absent from the workplace for a year prior to her termination. During that absence, TVA management repeatedly corresponded with Wellington in an attempt to gather information about her medical condition and expected date of return to work. Despite these

31

efforts, neither Wellington nor her doctor provided Widows Creek management with an expected return to work date. Because Wellington was completely unable to come to work, she cannot establish a prima facie case of racially discriminatory or retaliatory termination.

Even assuming a prima facie case, the defendants have articulated a legitimate, nondiscriminatory reason. Plaintiff was terminated due to her unavailability for work and failure to provide her employer with an expected return date. Widows Creek management needed someone in the position who was able to come to work and perform the job duties. Management was not obligated to hold Wellington's position open for an indefinite period of time. *See Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir. 1998) ("The ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence."); *Christian v. St. Anthony Med. Ctr., Inc.*, 117 F.3d 1051, 1053 (7th Cir. 1997) (holding that the ADA does not protect an employee from being fired because of illness). The evidence reflects that Wellington had been absent from the workplace for a year and had given no indication of a date of her expected return to work before she was terminated. Under these circumstances, Widows Creek management was justified, under the law, in terminating Wellington's employment.

The retaliation claim fails for a second reason. The evidence establishes that Wellington's last EO complaint before her termination was filed on May 9, 1998, nearly a year preceding the termination. The Supreme Court recently held that Title VII plaintiffs alleging retaliation could not establish a causal connection between the protected activity and the adverse employment action when the protected activity preceded the adverse employment action by twenty months. *Clark County Sch. Dist. v. Breeden*, 532 U.S.268, 121 S. Ct. 1508, 1511, (2001).

The Court in *Breeden* cites with approval *Richmond v. ONEOK, Inc.*, 120 F.3d 205 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168 (7th Cir. 1992). *See id.* In *Richmond*, the Tenth Circuit found that a three month period between the protected activity and the adverse action was too long to establish a causal connection in a retaliation claim. *See* 120 F.3d at 209. In *Hughes*, the Seventh Circuit found that a four month period was too long to establish a causal connection. *See* 967 F.2d at 1174. In this case, Wellington filed her last EO complaint before being terminated on May 9, 1998. On March 12, 1999, Finke made the decision to terminate her. Following the reasoning of the Supreme Court, the adverse employment action taken twelve months after the protected activity suggests no causal connection between the two. *See Breeden*, 121 S. Ct. at 511. Therefore, Wellington has failed to establish a prima facie case of retaliatory termination.

Even assuming that Wellington could establish a prima facie case for race discrimnation or retaliation, defendants have presented legitimate, nondiscriminatory and non-retaliatory reasons for Widows Creek management's decision to terminate Wellington's employment. She was terminated due to her unavailability for work for over a year and her failure to indicate when she expected to return to work. Defendants needed someone to do the job, and Wellington's absence was causing some hardship. If Wellington were able to return to work and do the job in the future, then they needed to know when. Because Wellington gave no indication of when she would be able to return, she left Widows Creek management with insufficient information to reasonably allocate their personnel resources.

Wellington argues that these reasons are pretext for discrimination and retaliation. First, Wellington argues that because she was taking unpaid leave, no financial hardship resulted.

33

Because Franks performed the duties she had previously performed, no personnel resources

hardships existed. Though Widows Creek experienced no financial hardships from Wellington's

leave, it did experience personnel resources difficulties. Franks and Vogt each performed about

fifty percent of the duties that Wellington had performed when she was there. (Vogt. Dep. at 48-

49.) Therefore, hardship did result from Wellington's absence and refusal to provide an

expected return date. Second, Wellington argues, there is pretext because two white employees,

Cheryl Machen and Wayne Jackson, were permitted to take indefinite LWOP and were not

terminated. It is undisputed, however, that Machen was approved, in April 2000, for LWOP for

approximately a year, (Finke Decl. ¶ 2; McCarver Decl. ¶ 3)[14], rather than LWOP for an

indefinite time. Unlike Wellington, Machen informed management of a date certain for her

return. The record shows that Machen returned to her job at Widows Creek on April 10, 2001.

(McCarver Decl. ¶ 5). Furthermore, Finke, who made the decision to terminate Wellington had

no knowledge of Jackson, (Finke. Decl. ¶ 6), whose leave, Wellington concedes, occurred, if at

all, in the late 1970s, some twenty years before Finke or Vogt came to Widows Creek. There is

no evidence from which a reasonable jury could infer that Jackson worked for TVA and was

given an indefinite LWOP. Consequently, Wellington has not presented sufficient evidence by

---

[14] Wellington moves the court to strike these declarations, because they were filed after
the time set for plaintiff to file evidence in opposition to the motion in support of which they are
submitted. (Mot. Strike Decls.) Generally, the court agrees with Wellington's argument that
when faced with such a situation the court may either strike the evidence or grant the nonmoving
party the opportunity to respond to untimely-filed evidence. The court agrees that under Rule
6(b), an affidavit filed in support of a motion must be served with that motion, and that failure to
comply with the rule could prejudice the non-moving party if there were evidence the party
could use to respond to the untimely-filed evidence. However, because attorneys for Wellington
acknowledge that Wellington would have no evidence to offer in response to these untimely-
filed affidavits, Wellington was not unfairly prejudiced by them. Therefore, plaintiff's motion to
strike the declarations should be denied.

which a reasonable jury could conclude that defendants' articulated legitimate,

nondiscriminatory reason is a pretext for illegal race discrimination or retaliation.  Therefore,

these claims are due to be dismissed.

### 3. Retirement Benefits

In her complaint, Wellington alleged that she was denied retirement benefits beginning

April 1999, on account of race discrimination and retaliation.[15]  (Compl. ¶ 11.)[16]  A Title VII

plaintiff may establish a prima facie case of race discrimination by proving that (1) she is a

member of a protected class; (2) she was subjected to adverse employment action; and (3) her

employer treated similarly-situated persons outside of her protected class more favorably.  *See*

*Holifield v. Reno.*, 115 F.3d at 1562.  Plaintiff cannot establish her prima facie case.  First,

plaintiff cannot satisfy the first element of the test because, although plaintiff is black, (Talley 2d

Decl., Ex. 4 at 2), it is undisputed that the decision-maker, Smith, had no knowledge of

plaintiff's race when he made the decision denying her request for immediate retirement

benefits, (Smith Decl. ¶ 6).  Moreover, there is no evidence that anyone who knew plaintiff's

---

[15] Wellington refers to the denial of her application for immediate retirement benefits as a background fact in her complaint.  However, she does not employ the denial as a factual basis for a claim for relief in any of the five counts in the complaint.  *See* Rule 8, Fed. R. Civ. P. Furthermore, at oral argument, counsel for Wellington voluntarily withdrew this claim. Therefore, this claim is not properly before the court and can afford no basis for relief.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate the arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

[16] Plaintiff also alleges as a background fact in paragraph seven of the complaint that this denial was based on sex.  However, she did not claim sex discrimination as a theory of recovery in her complaint.  She did not argue it in response to defendants' motions for summary judgment.  Therefore, any presumptive claim of sex discrimination is not properly before the court.  *See Resolution Trust Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

race influenced Smith's decision. There is no prima facie case of race discrimination where the decision-maker does not know plaintiff's race. *See Robinson*, 847 F.2d at 1316; *Gibson*, 785 F.Supp. at 682; *Chandoke*, 847 F.Supp. at 19; *Dodson*, 678 F.Supp. at 772. Second, plaintiff cannot establish the third element because she has not shown that there are any similarly situated employees who were granted immediate retirement benefits. Plaintiff testified that two former white employees at Widows Creek, Roden and Cox, like herself, were terminated for cause, but applied for and received immediate retirement benefits. However, TVARS Rules dictate the payment of retirement benefits and provide that if an employee is terminated for cause, pension payment does not commence until the employee attains age fifty-five. Because Roden and Cox were fifty-five when they were terminated, they are not "similarly situated" to plaintiff, who was forty-eight when she was terminated.

In order to establish a prima facie case of unlawful retaliation in violation of Title VII, plaintiff must show: (1) that she engaged in statutorily protected expression; (2) that she experienced an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *See Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) (citation omitted). Because Wellington had engaged in prior EO activity and was denied immediate retirement benefits, she has established sufficient evidence supporting the first and second elements of her prima facie case. There is not sufficient evidence, however, to support the third element. Because it is undisputed that Smith was unaware of plaintiff's participation in EO activity when the decision to deny benefits was made, (Smith Decl. ¶ 6), there is no causal link between the protected expression and the adverse action. In order to satisfy the "causal link" element of a prima facie retaliation case, plaintiff must prove that the

36

decision-maker was actually aware of the protected expression at the time the decision-maker took the adverse employment action. *See Raney*, 120 F.3d at 1197. Because plaintiff has not provided sufficient evidence to establish a prima facie retaliation case, this claim is due to be dismissed.

Furthermore, even assuming a prima facie of race discrimination or retaliation, defendant has articulated a legitimate, nondiscriminatory reason for the denial of immediate retirement benefits. An employee who has been terminated for cause is ineligible for immediate retirement benefits until he or she attains age fifty-five. Plaintiff argues that this is pretext because Cox and Roden were terminated for cause but were allowed to draw immediate retirement benefits. However, both Cox and Roden were over fifty-five when they were awarded benefits. Therefore, plaintiff has not shown that defendants' legitimate nondiscriminatory reason is a pretext for unlawful discrimination. Therefore, plaintiff's claim that her denial of immediate retirement benefits was motivated by race or retaliation is due to be dismissed.

**D. Disability Discrimination Claims**

Wellington alleges that she was subjected to disability discrimination in violation of the ADA regarding her termination and receipt of the unsatisfactory service review. (Compl. ¶¶ 122-36.) The ADA, however, does not apply to TVA. *See* 42 U.S.C. § 12111(5)(B)(i). Even if Wellington could assert a claim against TVA under the ADA, she could not survive defendants' motion for summary judgment.

A plaintiff advancing a claim of employment discrimination under the ADA must make a prima facie case establishing that (1) he has a disability, (2) he is a qualified individual, that is, able to perform the essential functions of the employment position that he holds or seeks with or

without reasonable accomodation, and (3) the defendant unlawfully discriminated against him because of the disability. *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000). Wellington cannot establish a prima facie case under the ADA, because she cannot establish that she is a qualified individual. From April 15, 1998, until April 16, 1999, the day she was terminated, both Wellington and her doctor consistently maintain that Wellington was not able to work. It is undisputed that Wellington was not able to be at work on a routine basis when the decision was made to terminate her. Because she is not a "qualified individual," she cannot establish a prima facie case under the ADA. *See Jackson*, 22 F.3d at 278-79 ("qualified" means that the claimant can perform the essential functions of the job, and holding that an individual's presence at work on a routine basis is an essential job function). Therefore, Wellington's ADA claim is due to be dismissed.

Even if Wellington could assert a valid disability claim at this late stage, it would have to be asserted under the Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794 (1994), which is the proper statutory basis for claims of disability discrimination against Federal agency employers. To establish a prima facie case under the act, the plaintiff must demonstrate that she is: (1) disabled within the meaning of the Act and the relevant regulations, (2) is "otherwise qualified" for the position in question, (3) worked for a Program or activity conducted by an Executive agency and (4) was adversely treated solely because of her disability. *See Jackson*, 22 F.3d at 278.

For the reasons stated above, the issuance of an unsatisfactory service review does not constitute actionable adverse action because it was not made the basis for any action affecting the terms, conditions, or privileges of Wellington's employment. Although termination is an

38

actionable adverse action, the Rehabilitation Act can afford Wellington no basis for relief, because she is not an "otherwise qualified" person.  In the employment context, an otherwise qualified person is one who can perform "the essential functions" of the job in question.  *School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 287 (1987).  Because Wellington did not appear at work on a routine basis for an entire year preceding her termination, she cannot show that she was an "otherwise qualified" individual.  *See Jackson*, 22 F.3d at 278.  Therefore, even if Wellington had asserted claims under the Rehabilitation Act, defendants' would be entitled to judgment as a matter of law.  Wellington's disability discrimination claims are due to be dismissed.

## CONCLUSION

For the reasons stated herein, the court concludes that defendants' second and third partial motions for summary judgment, which address all remaining claims in this case, are due to be granted.  Plaintiff's motion to strike affirmative defense and motion to strike declarations are due to be denied.  An order granting defendants' motions, denying plaintiff's motions and dismissing this case will be entered contemporaneously herewith.

**DONE** this ___25th___ day of September, 2001.

Sharon Lovelace Blackburn
_____
**SHARON LOVELACE BLACKBURN**
United States District Judge

39